## Stahl, Appellant, *v.* Pennsylvania Co.

155  309
166  527

*Railroads—Dwelling house—Injunction—Act of Feb.* 19, 1849.

A preliminary injunction to restrain a railroad company from taking a portion of a lot in a borough will not be awarded where it appears that the proposed appropriation will not pass through a dwelling house on the lot or destroy or interfere with its use, or the use of any outbuilding or outbuildings, or interfere with access to the house or outbuildings, and that the strip proposed to be taken will be cut entirely off one side of the lot, leaving no waste strip between it and the railroad.

Argued April 14, 1893. Appeal, No. 32, Oct. T., 1893, by plaintiff, Jemima Stahl, and Jacob Stahl, her husband, from decree of C. P. Beaver Co., Dec. T., 1892, No. 3, refusing preliminary injunction. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and THOMPSON, JJ.

Bill to restrain interference with dwelling by railroad.

The facts appear in the following opinion of the court by WICKHAM, P. J. :

" At the hearing of the application for the preliminary in-

junction, it was agreed in open court by the counsel on both sides, that all the testimony taken by the commissioner referred to in the fifth paragraph of the defendant's answer should be considered and used in this proceeding in place of the usual affidavits.

" The commissioner's findings of fact, from Nos. 1 to 11 inclusive, accompanying the testimony, are adopted by the court and made a part of this opinion.   They are as follows, viz.:

" 1.  That Jemima Stahl, at the time of the entry of the Pennsylvania Company, was the owner, in fee, of a certain piece, parcel, or lot of ground at the corner of Walhording street or Island lane and Monroe street, in the borough of Rochester, in Beaver county, Pennsylvania, said lot having a frontage of one hundred and thirty-two feet on the west, on Island lane, and extending back along Monroe street, on the south, one hundred and twenty feet to the present track of the Pennsylvania Company.

" 2.  That the eastern boundary of said lot is an earthen bank, about twenty feet high, lying at an angle of forty-five degrees to the plane of the lot; that that part of Monroe street, between Island lane and said bank, is a cul de sac, rendering it impossible to go from the creek or Island lane along Monroe street to the upper part of the town.   No one but the Stahls use that part of Monroe street.

" 3.  That erected on said lot, on the southeast corner, near the foot of said bank, is the dwelling house of said Jemima Stahl, now in the occupancy of herself and family, said dwelling house being a two story frame building $41 \times 16$, containing six rooms, with a one story frame kitchen attached thereto.   That the front of said dwelling is distant 27 feet back from Island lane.

" 4.  That said building is distant, at its southeast corner, seven and seven tenths feet from the line of the proposed appropriation, and, at its northeast corner, six feet, and that said building lies along the southern line of said lot, on the north line of Monroe street.

" 5.  That between said building and the foot of the bank forming the eastern boundary of said lot is a small shed, or outbuilding, 8 feet 8 inches by 5 feet 6 inches, used as a ware-room or place of storage, the eastern wall of said shed or out-

building being covered up, a distance of about four feet from the ground, with the bank above mentioned; that there is no path, walk, steps, or other means of access to said lot and premises from the street on the east side of the house.

" [6. That said shed or outbuilding is no part of the dwelling house to which it is attached, as there is no means of access to it from the other part of the house, the only entrance to it being from a door on the north side thereof, fastened on the outside with a hasp and staple; that it has no other door or window in it, is not floored or otherwise made habitable.] [1]

" [7. That said shed or outbuilding can be removed from its present location and attached to any other part of the building without destroying it or interfering with its present use.   That this will give better access to the lot than with said outbuilding in its present location.] [2]

" 8. That the entire lot contains 15,840 square feet, and is inclosed with a fence, save where the house forms the boundary, and on the eastern side; that after taking off the amount of the proposed appropriation there is still left sufficient ground for the necessary outbuildings, undisturbed in their present position, nor does it interfere with free access to them.

" [9. That the proposed appropriation does not pass through the dwelling house or any part of it, nor does it destroy it or interfere with its use, or the use of any outbuilding or outbuildings; that it will not be necessary to remove said shed or outbuilding, the side of a passing train being at least four feet from its eastern edge.   Nor does said appropriation cut through or destroy the curtilage, as the strip proposed to be appropriated is cut entirely off the east side, leaving no waste strip between it and the present tracks of the company; the strip proposed to be acquired being the bank forming the present foundation of the track.] [3]

" [10. That the proposed appropriation and placing the tracks thereon does not in any way interfere with free and easy access to said building and premises, nor does it, in any way, interfere with, or affect the curtilage necessary to the use and enjoyment of said house.] [4]

" 11. That the Pennsylvania Company is the lessee of and operates the Pittsburgh, Fort Wayne & Chicago Railway, successor to the Ohio & Pennsylvania Railroad Company, exercis-

ing rights of eminent domain; that in widening, straightening, and otherwise improving its tracks it has appropriated an irregular strip off the eastern side of said lot, said strip being thirty-seven feet wide at its northern end, and preserving the same width until it reaches within twenty feet of the north line of Monroe street, when it narrows to twenty-nine feet; that said strip contains 4868 square feet, reducing the lot to 10,972 square feet.

"In the last finding, the commissioner inadvertently uses the words 'has appropriated,' instead of 'seeks to appropriate' or some equivalent expression.

"The court is not satisfied that the proposed taking, by the defendant company, is prohibited by § 10 of the act of Feb. 19, 1849. While Mrs. Stahl's house will be made less comfortable for occupancy and her whole property depreciated in value, it does not appear that there will be either an actual or constructive passing through the house, any more than would be the case, if a railway were laid on Monroe street, the same distance from the side of the building that the defendant's new track will be from its rear. Indeed, a track on Monroe street, placed as suggested, would injure the house, as a place of residence, much more than will the cutting off the rear of the lot, and yet it can hardly be contended that a track so situated would constructively pass through the dwelling.

"It must be kept in mind that the legislature never intended that mere inconvenience and discomfort, although very great, to the occupants of a dwelling house, should bring the case within the prohibitive clause of the statute. To hold otherwise, would, in very populous communities, make the exception in the statute the rule, and make the rights of way for new railways so costly and hard to obtain as to prevent them, in most cases, from being built at all. In Lyle v. R. R. Co., 131 Pa. 437, the last case on the subject under consideration decided by our Supreme Court, an evident desire is apparent to get nearer to the literal and popular sense of the statutory words, 'passing through any dwelling house,' than was shown perhaps in the earlier decisions. In Maine, the word 'dwelling,' used in a statute similar to ours, has been held to mean the house proper and to include no curtilage whatever: Wells v. S. & K. R. R. Co., 47 Maine, 345.

" In the present case, nothing will be actually taken which is essential to the reasonable use and enjoyment of the dwelling house.   Considering the size, character and use of the building, and the fact that it is in a borough where residence lots are ordinarily quite limited in area, it would seem that there is left a sufficient curtilage.   As to the discomforts and dangers from smoke, sparks and noise, which are necessary incidents of the operations of every railway and are experienced in common by all who live near it, whether the tracks are on their own lands or those of others, they would not constitute a constructive passing through the house, and cannot be looked at in deciding the question now before the court.   This will be more evident, when we consider, that they would not furnish even a pretext for an   injunction, if the ground to be taken and occupied happened to be owned, not by the plaintiffs, but by some one else : Penna. R. R. Co. v. Lippincott, 116 Pa. 472 ;  Penna. R. R. Co. v. Marchant, 119 Pa. 541 ;  Penna. Co. for Ins. etc. v. R. R. Co., 151 Pa. 334.

" In the language of the opinion in Lyle v. R. R. Co., supra, [this ' is a case for damages and not for an injunction.'] [6]

" [And now, to wit, Dec. 12, 1892, injunction refused.] " [12]

*Errors assigned* were (1–4, 6, 12) portions of opinions in brackets, quoting them.

*J. F. Reed,* for appellant, cited : Act of Feb. 19, 1849, P. L. 83.

*Edward B. Daugherty,* for appellee, not heard, cited : Lyle v. R. R., 131 Pa. 437 ;  Pa. R. R. v. Lippincott, 116 Pa. 472.

Per Curiam, May 1, 1893 :

It appears that, by agreement of counsel, at the hearing of application for preliminary injunction, all the testimony taken by the commissioner, referred to in the fifth paragraph of defendant's answer, was used and considered in lieu of injunction affidavits.   In view of the facts thus presented to the court, we agree with the learned president of the common pleas, in his conclusion, that this is not a proper case for a preliminary injunction.

Adhering to our general rule, in appeals of this kind, we forbear expressing any opinion, except on the single question properly presented by the record, viz.: whether the learned judge erred in refusing to grant the injunction. Being of opinion that he did not, the decree is affirmed and appeal dismissed, with costs to be paid by the appellants.